UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| MARGARET BENSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:19-cv-41-LEW |
| | ) |
| WAL-MART STORES EAST, L.P, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT WAL-MART STORES EAST, L.P.'s MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Margaret Benson, brings this lawsuit against her former employer, Defendant Wal-Mart Stores East, L.P. ("Wal-Mart"), alleging she was fired in violation of several provisions of Maine state law. The Defendant removed the case to this Court on the basis of diversity jurisdiction. 28 U.S.C. § 1332. Now before me is Defendant's Motion for Summary Judgment. ECF No. 23. In it, Wal-Mart argues that it did not unlawfully discriminate or retaliate against Ms. Benson when it fired her in February 2017. For the reasons that follow, the Defendant's Motion is GRANTED, and this case is DISMISSED.

### SUMMARY JUDGMENT FACTS

The summary judgment facts are drawn from the parties' stipulations, if any, and from their statements of material facts submitted in accordance with Local Rule 56. The Court will adopt a statement of fact if it is admitted by the opposing party and is material to the dispute. If a statement is denied or qualified by the opposing party, or if an

evidentiary objection is raised concerning the record evidence cited in support of a statement, the Court will review those portions of the summary judgment record cited by the parties, and will accept, for summary judgment purposes, the factual assertion that is most favorable to the party opposing the entry of summary judgment, provided that the record material cited in support of the assertion is of evidentiary quality and is capable of supporting the party's assertion, either directly or through reasonable inference. D. Me. Loc. R. 56; *Boudreau v. Lussier*, 901 F.3d 65, 69 (1st Cir. 2018)

Plaintiff, Margaret Benson, began working for Wal-Mart at its Windham, Maine location in February 2013. Over a year later, in October of 2014, she suffered a work-related injury, which resulted in a period of unpaid leave from her position as a grocery reclamation associate. That leave lasted until June 2015, when Wal-Mart offered Ms. Benson a temporary alternate duty ("TAD"), or light duty, position due to her work-related injury. In March 2016, while still employed by Wal-Mart, Ms. Benson filed a disability discrimination claim related to her 2014-15 unpaid leave. *Benson v. Wal-Mart Stores E.*, L.P., No. 2:16-CV-114-DBH, 2017 WL 2729491 (D. Me. June 23, 2017) (hereinafter *Benson I*). The Court ultimately granted summary judgment in favor of Wal-Mart on all counts. *Id.* at *5.

By April 2016, Ms. Benson took another unpaid leave of absence due to a "bad reaction" to a medication prescribed for her work-related injury. Def.'s State. of Material Facts ("DSMF"), ECF No. 24, ¶ 4. Ms. Benson followed Wal-Mart procedure by requesting leave from Kathie Burns-Egan—the Windham Wal-Mart Personnel Coordinator—who routed it to the necessary party at Wal-Mart. *Id.* ¶ 7. On October 14,

2

2016, while *Benson I* was still pending, Ms. Benson returned to work at another TAD position as a People Greeter in the Windham Store on a 6 a.m. to 2 p.m. shift. *Id.* ¶¶ 8, 21. Soon after she returned from leave, however, Ms. Benson began to miss a substantial amount of time from work. *Id.* ¶¶ 24–26.

Wal-Mart's Attendance/Punctuality Policy ("Attendance Policy" or the "Policy") in effect in October 2016 permitted associates nine "occurrences" in any rolling six-month period before the associate would be subject to termination. *Id.* ¶ 10. The Attendance Policy assigned one occurrence for unauthorized full-day absences and/or late arrivals or early departures of more than 120 minutes. *Id.* ¶ 13. The Policy provided that absences for certain reasons, including in relevant part for leaves of absence, reasonable accommodation, and "workers' compensation," would be "authorized" and therefore would not constitute occurrences. *Id.* ¶ 14. Although the term "workers' compensation" is not defined in the Attendance Policy, Windham store management reasonably interpreted the term to include leaves of absence for a workers' compensation-related injury authorized by Wal-Mart's third-party leave administrator, Sedgwick, as well as time an associate was required to miss work in order to attend a medical appointment for treatment of a work-related injury. *Id.* ¶ 15.

Wal-Mart expected associates who needed to miss work for scheduled workers' compensation-related medical appointments to request the time off in advance. *Id.* ¶ 16. There were a few ways to do so. Wal-Mart's written Policy expected employees to request time off either through a designated 1-800 number or the "Wal-Mart One" website. *Id.* Testimony from Wal-Mart's representatives confirms that Wal-Mart also allowed

associates to request time off through a store's manager like Ms. Burns- Egan. *Id.* ¶ 16; Pl.'s Resp. to DSMF ("PRDSMF") ¶ 16.[1] When an employee was unable to request the time off in advance, Wal-Mart expected the employee to report his or her absence day-of in one of these three ways. *Id.* Windham store management also expected associates who missed work due to a medical appointment for a work-related injury to be able to produce documentation of their medical appointment upon request. DSMF ¶ 18; Bradstreet Dep. at 16:12-17; Burns-Egan Dep. at 24:23-25:25, 26:11-13. Finally, Wal-Mart asked associates to attempt to schedule their medical appointments during times when they were not scheduled to work; any time not used to travel to-and-from a workers' compensation-related medical appointment was not "authorized" by the Attendance Policy. *Id.* ¶ 19; Bradstreet Decl. ¶ 4.

Wal-Mart contends that, according to its Attendance Policy, Ms. Benson was absent from her scheduled shifts on October 18, October 20, October 21, October 28, November 5, November 7, November 12, November 28, and December 12, 2016; and she left more than 120 minutes early from her scheduled shifts on November 3, November 17, November 26, and December 8, 2016. *Id.* ¶ 24. Ms. Benson did not request any of this time off in advance using the computer system or Wal-Mart's 1-800 number, and did not provide Wal-Mart with medical documentation reflecting medical appointments on these dates when asked about them afterwards. As a result, Wal-Mart coded these absences as unauthorized under the Policy. *Id.* ¶ 25–26. Ms. Benson disputes that her absences were unauthorized,

---

[1] Wal-Mart disputes this fact, but based on the testimony of both Ms. Burns-Egan and Ms. Bradstreet, employees could notify a supervisor as well as pre-clearing their absence on either the website or the 1-800 number. Bradstreet Dep 6: 6-11; Burns-Egan Dep 6: 8-17.

pointing to evidence from her deposition and a supporting declaration that suggest she pre-approved these absences or tardies with store management, most often Ms. Burns-Egan. PRDSMF ¶¶ 25–26.

On December 12, 2016, Co-Manager at the Windham Store, Susan Bradstreet, was reviewing all associates' attendance records when she identified Ms. Benson's excessive occurrences. *Id.* ¶ 26. Ms. Bradstreet intended to speak with Ms. Benson on December 16, 2016, the next day that she and Ms. Benson were scheduled together, and to terminate Ms. Benson's employment for violating the Attendance Policy unless there was a valid explanation for her absences. *Id.* ¶ 27. On December 15, 2016, Ms. Benson was again more than 120 minutes late for her shift. *Id.* As with the other absences, Ms. Benson did not request this time off in advance in the computer system or through the 1-800 number. *Id.* ¶ 29. As a result, Wal-Mart coded this absence as an "occurrences," although Ms. Benson again points to evidence that she requested this time off from a manager. Benson Dep. 19:18-20:18.

Ms. Benson was entirely absent from her shift on December 16, 2016, so she did not meet with Ms. Bradstreet about her recent attendance issues. *Id.* ¶ 29. When Ms. Bradstreet and Ms. Benson met the following day, Ms. Benson stated that her absences on December 12 and 16 had been due to car trouble and the remainder of her absences were due to "workers' comp." *Id.* ¶ 30. To verify, Ms. Bradstreet asked Ms. Benson to bring in her medical records or review them so she could explain the absences related to workers' compensation. *Id.* ¶ 31. Because Ms. Benson expressed some confusion about the requirements for requesting time off for a workers' compensation appointment, Ms.

5

Bradstreet decided to hold off on Plaintiff's termination to give her an opportunity to demonstrate that her occurrences, which included a large number of full-day absences, were, in fact, due to workers' compensation appointments. *Id.* ¶¶ 33-35.

But miscommunication between Wal-Mart and Ms. Benson surrounding her attendance continued. She missed a full day of work on January 3, 2017, and failed to speak to a member of store management beforehand. *Id.* ¶ 36. Ms. Benson later reported that she missed work on this date "due to a reaction/complication of medicated [sic] prescribed for the workers comp injury . . . ." *Id.* ¶ 38. That same week, Ms. Benson was approximately six hours late to work on January 5, 2017. *Id.* ¶ 37. On January 6, Plaintiff emailed Ms. Bradstreet and Ms. Burns-Egan that she was tardy on January 5 because of a workers' compensation doctor's appointment. *Id.* ¶ 38. On January 9, 2017, Ms. Burns-Egan spoke to Ms. Benson about her January 5 absence, inquiring what time her appointment had been and why she had been unable to get to work until noon. *Id.* ¶ 39. Ms. Benson told Burns-Egan that her January 5 appointment had been at 8:40 a.m. and that her doctor sent her out for further testing after her appointment, which caused her to be so late. *Id.* ¶ 40. Ms. Benson and Ms. Burns-Egan also discussed an upcoming appointment on January 13, 2017, about which Ms. Benson had informed store management, and Ms. Benson told Burns-Egan that she expected to be at work by 10 a.m. that day. *Id.* ¶ 41. Of concern to her managers, Ms. Benson was missing significant time between the beginning of her shift at 6 a.m. and the beginning of her medical appointments without requesting that time off. DSMF ¶¶ 47-48. Ms. Benson responded that she decided not to go in to work before her morning appointments "because it cost too much in gas." PRDSMF ¶ 49.

On January 13, 2017, after arriving at work following her appointment, Ms. Benson sent an email to Ms. Bradstreet and Ms. Burns-Egan: "Today I gave Kathie a copy of my M1 form from Dr. Parris and asked for assistance in my time as there was an error. I punched in at 9:23, went to lunch at 9:25 and returned from lunch at 10:24. This is in all relation to workers' comp injury." *Id.* ¶ 42. This day's appointment highlighted that Ms. Benson would clock out for lunch only two minutes after arriving to work, and was missing time from the work day prior to appointments. *Id.* ¶ 43. Ms. Bradstreet relayed Wal-Mart's concerns about missing the start of a 6 a.m. shift and taking lunch hour immediately upon arrival to Ms. Benson. *Id.* ¶ 51. After finding out that Ms. Benson skipped the beginnings of her shifts, and took off-cycle lunch breaks, Ms. Bradstreet suspected that Ms. Benson might be missing significantly more time than required by her workers' compensation medical appointments. *Id.* ¶ 52. As a result, Wal-Mart coded Ms. Benson's absences on January 5 and 13 as in "conditional status," which meant the absences were conditionally authorized, pending Ms. Benson's production of documentation substantiating that she missed only as much time as necessary. *Id.* ¶ 53.

On January 19, 2017, Ms. Bradstreet and Ms. Benson met again. Ms. Bradstreet told Ms. Benson that she needed her to submit documentation of all of her prior medical appointments, reflecting the location, date, and how long each appointment lasted. *Id.* Ms. Bradstreet told Ms. Benson she needed this same information for any future appointments as well. *Id.* ¶ 54.

The next day, Ms. Benson sent an email to the Market Human Resources Manager, Wayne Gottwald, and to Ms. Burns-Egan: "Because of the work injury and because of the

actions that were taken by Susan Bradstreet numerous times yesterday, January 19th, I am feeling more and more that I am feeling harassed. If you need a further explanation, I or my attorney can respond. The harassment needs to stop. It is illegal and unfair." *Id.* ¶ 56. Mr. Gottwald has no recollection of receiving this email or doing anything with it. Ms. Bradstreet, who was not copied on the email, was unaware of the email or any purported complaint of "harassment" prior to her deposition in this case. *Id.* ¶ 57–58.

The several absences over the next few work weeks and the failure to submit documentation from previous absences sealed Ms. Benson's fate. On February 8, 2017, Ms. Benson was absent for a full day. Using the web-based call-in procedure, Ms. Benson did not attribute this absence to illness or injury. She also did not speak with a member of store management on February 8 about the reason for her absence. *Id.* ¶ 61. On February 10, 2017, Ms. Benson was tardy, and she had not requested time off in advance or notified store management in advance that she had a medical appointment on this date. *Id.* ¶ 62. On February 16, 2017, Ms. Benson again missed a full day of work. Using the web-based call-in procedure, Ms. Benson attributed her absence to "no reason." *Id.* ¶ 64.

On February 18, 2017, Ms. Bradstreet terminated Ms. Benson's employment for violation of the Attendance Policy. *Id.* ¶ 70. At the time of Ms. Benson's termination, she had accrued twenty-one occurrences, and the only medical documentation Ms. Benson had submitted to the store consisted of several M-1 forms. None of these forms indicated the time or duration of Ms. Benson's appointments and Ms. Benson produced no documentation indicating she had medical appointments on any other dates. *Id.* ¶¶ 65–67.

Claims Management, Inc. ("CMI"), which administers workers' compensation claims for Wal-Mart, paid medical bills for appointments Ms. Benson attended on November 3, 2016, December 15, 2016, January 5, 2017, January 13, 2017, and February 10, 2017. *Id.* ¶ 68. CMI refused to pay a number of other medical bills Ms. Benson submitted for payment, on the ground that they were related to non-work-related medical conditions. *Id.* ¶ 69.

Wal-Mart also filed a substantial amount of comparator information as part of its Motion for Summary Judgment. The Windham store enforced the Attendance Policy rigidly and consistently during the last year of Ms. Benson's employment. Between April 2016 and April 2017, more than 35 other Windham store employees were terminated for exceeding the allowable number of occurrences under the policy. *Id.* ¶ 73. None had as many occurrences as Ms. Benson and most were terminated for having between nine and eleven occurrences. *Id.* ¶ 74.

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As cautioned by the Supreme Court, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A material fact is one that has the potential to determine the outcome of the litigation. *Id.* at 248; *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). To raise a

genuine issue of material fact, the party opposing the summary judgment motion must demonstrate that the record contains evidence that would permit the finder of fact to resolve the material issues in his favor. *See Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999). Alternatively, the party moving for summary judgment may demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether the moving party has met its burden, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).

A. COUNT ONE – DISABILITY DISCRIMINATION

The Defendant first argues that it is entitled to judgment as a matter of law on Count One, a claim under the Maine Human Rights Act ("MHRA") that Wal-Mart discriminated against Ms. Benson on the basis of disability by allegedly terminating her due to an injury or by failing to accommodate her need to miss work due to medical appointments. To prevail on her disability discrimination claim under the MHRA, Ms. Benson must establish: (1) that she suffers from a disability; (2) that she is nevertheless able to perform the essential functions of her job with or without reasonable accommodation; and (3) that Wal-Mart took an adverse employment action against her because of her disability. *See, e.g., Richardson v. Friendly Ice Cream Corp.*, 2008 WL 4372730, at *8 (D. Me. Oct. 29, 2008) (citing *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 104 (1st Cir. 2005).[2] For the

---

[2] The First Circuit has held that the elements and procedures of MHRA claims for discrimination and retaliation are substantially the same as for federal claims, and courts should construe and apply the MHRA "along the same contours as the ADA." *Dudley v. Hannaford Bros., Inc.*, 333 F.3d 299, 312 (1st Cir.

reasons that follow, I will grant Defendant's motion for judgment as a matter of law on Count One.

### a. Ms. Benson Is Not a "Qualified Individual" Under The MHRA

Ms. Benson's discrimination claim suffers from a fatal flaw: she cannot show she is a "qualified individual" deserving of protection under the statute. Under the MHRA, Ms. Benson bears the burden of proving that she is a "qualified individual," which means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires." 5 M.R.S. § 4553 (8-D). The relevant questions for purposes of this element are: (1) could Ms. Benson perform the essential functions of her job; and (2) if not, has she identified any reasonable accommodation that would enable her to perform those functions? *See e.g. Ward v. Massachusetts Health Research Institute, Inc.*, 209 F.3d 29, 33 (1st Cir. 2000).

### i. Essential Functions of a People Greeter

Essential functions are "fundamental job duties," and not "marginal functions." 94-348 C.M.R. ch. 3, § 2 (9)(A). A job function may be essential because the position exists to perform that function or because there are a limited number of employees available to perform the function. *Id.* It almost goes without saying, but it bears emphasizing here that the First Circuit has held "attendance is an essential function of any job." *Rios-Jimenez v. Principi*, 520 F.3d 31, 42 (1st Cir. 2008). Attendance is particularly essential for a People Greeter because that position exists for the purpose of ensuring that customers are

---

2003); *Cutting v. Down E. Orthopedic Assocs., P.A.*, No. 1:16-CV-00582-JCN, 2019 WL 1960329, at *8 (D. Me. May 2, 2019).

personally greeted and offered assistance as they enter and exit a Wal-Mart. DSMF ¶ 22; *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) ("That general rule—that regularly attending work on-site is essential to most jobs, especially the interactive ones—aligns with the text of the ADA."). Moreover, the Windham store scheduled only one People Greeter at each entrance. DSMF ¶ 23. So, when Ms. Benson arrived late to work or was absent, the Windham Store went without a People Greeter and the customers entering or exiting through her assigned entrance went without being greeted or offered assistance.

Ms. Benson argues Wal-Mart failed to carry its burden at the summary judgment stage of showing that attendance is necessary to do the job of a People Greeter, and that Wal-Mart could not have offered her a reasonable accommodation to perform the role of People Greeter *in absentia*. In the ADA context, which the MHRA tracks, the First Circuit has identified a non-exhaustive list of factors that suggest a job duty is "fundamental." *See Mulloy v. Acushnet Co.*, 460 F.3d 141, 147 (1st Cir. 2006) (noting that evidence of whether a particular function is essential includes, but is not limited to "the employer's judgment, written job descriptions, the work experience of past incumbents of the job, and the current work experience of incumbents in similar jobs."). Because Wal-Mart does not point to the First Circuit's list, Ms. Benson argues it has failed to adduce sufficient proof on this element.

But the need for attendance is self-evident in this case. People Greeter is not a job that can be done remotely, and the record shows that the position goes unfilled when there is an unexpected absence. DSMF ¶ 23. Wal-Mart may not have walked through each of

the factors noted in *Mulloy*, but the job description, the record, and common sense all bring one to the ineluctable conclusion that attendance is essential for a People Greeter.

### ii. Reasonable Accommodation

Having found that Ms. Benson could not perform the "essential functions" of a People Greeter, I also find there is no evidence of a "reasonable accommodation" Wal-Mart could have made to allow her to do so. In late 2016 to early 2017, the time period at issue in this case, the MHRA expressly permitted employers to discharge employees who, because of their disability, were "unable to be at, remain at or go to or from the place where the duties of employment are to be performed." 5 M.R.S. § 4573-A (1-B). The Law Court has held that Section 4573-A (1-B) of the MHRA renders leave an unreasonable accommodation under state law. *Carnicella v. Mercy Hospital*, 2017 ME 161, ¶ 22, 168 A.3d 768, 774. And the only accommodation Ms. Benson proposes in this lawsuit is forgiveness for the days of work she missed for medical appointments—not a "reasonable accommodation" in the language of the MHRA. *See* Def.'s Resp. at 17. Because Ms. Benson's request for leave does not qualify as a "reasonable accommodation" under the MHRA, and there is no evidence of another requested accommodation in the record, I find she has failed to generate a genuine issue of material fact concerning the first element of her disability discrimination claim, and Wal-Mart is therefore entitled to summary judgment on Count One.

### B. COUNTS 2 AND 3 – RETALIATION CLAIMS

Ms. Benson's Counts Two and Three allege she was fired in retaliation for engaging in activities protected under the Maine Whistleblower Protection Act ("MWPA") 26

M.R.S.A. § 833(1)(B)[3] and related provisions of the MHRA. Specifically, she believes one or more of the following motivated her termination: (1) her first disability discrimination lawsuit against Wal-Mart (*Benson I*); (2) her January 2017 request to work non-consecutive days; or (3) her January 20, 2017 email to Wayne Gottwald and Kathie Burns-Egan, in which she contended she was being "harassed," and in a way that was "illegal and unfair" (the "January 20 email"). Wal-Mart concedes that at least two of these activities are "protected" under either the MWPA or MHRA—*Benson I* and Ms. Benson's January 2017 request to work nonconsecutive days. Mot. For Summ. J. at 9. For purposes of this opinion I assume the January 20 email would be protected activity as well. *See* M.R.S.A. tit. 26, § 833(1)(A).

To prevail on either Count Ms. Benson must establish (1) that she engaged in protected activity; (2) that she suffered a materially adverse action or was adversely affected; and (3) that there was a causal connection between the protected activity and the adverse action. *Fuhrmann v. Staples Office Superstore E., Inc.*, 58 A.3d 1083, 1090 (Me. 2012). Defendant argues there is no evidence in the record to support the causal connection between Ms. Benson's protected activity and her ultimate termination. Both claims require a showing of but-for causation, meaning that the adverse action must have been substantially motivated by the employee's protected activity. *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 349 (1st Cir. 2018) (MWPA); *Ramsdell v. Huhtamaki, Inc.*, 992 F.Supp.2d 1, 21 (D. Me. 2014) (MHRA).

---

[3] "Although the MWPA itself provides no private right of action, complainants may, after appropriate administrative process, file a civil action under the MHRA." *Tripp v. Cole*, 425 F.3d 5, 9 (1st Cir. 2005).

Though similar, these claims typically require two different legal analyses—the familiar *McDonnell Douglas* burden-shifting analysis for MHRA retaliation claims, and a "Maine-specific retaliation paradigm" for claims brought under the MWPA. *Theriault* 890 F.3d at 349. Though these two approaches frame the question differently, the burden on the nonmoving Plaintiff at the summary judgment stage is the same: "the Maine-specific retaliation paradigm obligates the plaintiff to adduce precisely the same quantum of proof that she would have had to adduce to defeat summary judgment under the *McDonnell Douglas* framework." *Id.* Therefore, instead of burden-hopping as *McDonnell Douglas* would have me do, I simply look at the evidence of causation in the light most favorable to the Plaintiff, Ms. Benson, to determine whether "the adverse employment action was motivated at least in part by protected activity." *Id.* (*citing Brady v. Cumberland Cty.*, 2015 ME 143, ¶ 37, 126 A.3d 1145, 1158, as corrected (Mar. 8, 2016)).

   *1. Causation*

Ms. Benson has alleged three different protected activities she believes motivated her termination in violation of the MWPA or the MHRA: *Benson I*, her January 2017 request to work non-consecutive days, and the January 20 email. Because I find she has failed to carry her burden to show causation for any of the three, as discussed in more detail below, I grant summary judgment on these two Counts to the Defendant.

First, I find Ms. Benson has not made out a connection between the filing of *Benson I* and her ultimate termination. Nearly a year elapsed between *Benson I* and Wal-Mart's decision to fire her, far too long to support an inference of causation based on timing alone. *See, e.g., Eaton v. Kindred Nurs. Ctrs. West, LLC*, 2005 WL 1185802 at *10 (D. Me. May

19, 2005) (finding ten weeks between protected activity and termination did not support a causal connection); *see also Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (holding that "temporal proximity must be 'very close'" to support the inference of cause-and-effect) (citations omitted). So, I look to the "larger picture" to see if a reasonable factfinder could draw an inference of causation. *Ponte v. Steelcase, Inc.*, 741 F.3d 310, 322 (1st Cir. 2014). A reasonable factfinder could not. Ms. Benson's string of absences and tardies began long after *Benson I* was filed, and the record evidence all suggests her recent attendance record was the only reason Wal-Mart had for firing her.

Following *Benson I*, Wal-Mart reinstated Ms. Benson from leave and provided her with a People Greeter position. And far from punishing Ms. Benson for having filed her previous lawsuit, Wal-Mart delayed firing her for several weeks to provide her with a reasonable opportunity to produce documentation of her medical appointments. DSMF ¶ 35. Only when Ms. Benson continued to miss work, including for reasons having nothing to do with any medical condition (DSMF ¶¶ 30, 61, 64) and on at least one occasion where she neglected to inform anyone at the store about her appointment in advance (DSMF ¶ 62), and failed to produce documentation to substantiate her missed time, did Wal-Mart finally fire her. DSMF ¶¶ 65–67, 70. Considering the larger picture, I find the evidence points to only one conclusion: Ms. Benson was fired for attendance issues in late 2016, early 2017, and not for having filed *Benson I*.

The same is true of the January 20, 2017 email. Absent some evidence that a decision-maker who advocated for her termination was aware of the email, a fact-finder could not possibly infer that the email was a but-for cause of her firing. *Pomales v.*

*Celulares Telefonica, Inc.*, 447 F.3d 79, 85 (1st Cir. 2006). It is undisputed that Ms. Bradstreet was the decision-maker who advocated for termination, and that she was unaware of the January 20 email until her deposition in this case. DSMF ¶ 58. The January 20 email was also sent to former Market Human Resources Manager Wayne Gottwald, who did not support the decision to fire Ms. Benson. DSMF ¶ 72. There is also no evidence that Ms. Burns-Egan, the other recipient of the January 20 email, had any role in the decision to terminate Ms. Benson's employment. Therefore, because Ms. Benson has failed to point to any evidence that the January 20 email contributed to Wal-Mart's decision to fire her, she has failed to satisfy the causation requirement for this protected activity as well.

Finally, Ms. Benson also cannot establish a causal connection between her alleged requests for accommodation and her termination. The only evidence before me on summary judgment is of Wal-Mart accommodating Ms. Benson's physical restrictions by placing her in the People Greeter position. Moreover, it is undisputed that Wal-Mart worked with Ms. Benson to obtain documentation of her medical appointments and that it was prepared to excuse or authorize missed time necessitated by workers' compensation medical appointments if she could come up with the paperwork. DSMF ¶¶ 53-54. And, concerning the request to work every other day, it is undisputed that Wal-Mart immediately responded by granting Benson's request and adjusting the schedule. DSMF ¶¶ 59-60. Critically, this request to work non-consecutive days, like the January 20 email, did not occur until well after Ms. Bradstreet began closely managing Ms. Benson's attendance and had already decided to terminate Ms. Benson's employment if she could not substantiate

her absences with sufficient medical documentation. *See* DSMF ¶¶ 53-54. The evidence all shows that Wal-Mart granted Ms. Benson's reasonable requests for employment, rather than holding them against her. Ultimately, because there is no evidence to support an inference that Wal-Mart retaliated against Ms. Benson for requesting reasonable accommodation, I find she has failed to meet her burden to show causation as to this protected activity as well.

Because Ms. Benson has failed to adduce sufficient evidence for a reasonable factfinder to conclude that her firing was motivated by any of her three alleged protected activities, I find the Defendant is entitled to judgment as a matter of law on both Counts Two and Three.

    2. *Pretext*

Not only is there weak evidence of causation, Ms. Benson has also failed to convincingly show Wal-Mart's stated reason for firing her—continued poor attendance—is at all pretextual. A plaintiff may show pretext by establishing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" for the challenged employment action. *Theriault*, 890 F.3d at 353. As both the Law Court and the First Circuit agree, "an employee's assertion of ... animus on the part of an employer will not survive summary judgment if she or he relies on mere 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Id.* at 354*; see also Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 20, 974 A.2d 276, 283.

And far from weak, implausible, or incoherent, Wal-Mart's reason for terminating Ms. Benson follows from her pattern of truancy and fits with its treatment of its other

18

employees. Ms. Benson repeatedly missed work or arrived at work late during her time as a People Greeter, and Wal-Mart's workers' compensation claim administrator, CMI confirms that Ms. Benson had workers' compensation medical appointments on only 5 of the total 21 days she missed work between October 2016 and February 2017. DSMF ¶ 68. Moreover, Ms. Benson failed to explain why she missed full days of work to attend medical appointments that could not have lasted more than an hour or why she was unable to be at work at 6 a.m. as scheduled when her appointments were not until 8:30 a.m. DSMF ¶ 28. Even disregarding the dates on which Wal-Mart's workers' compensation claim administrator paid medical expenses, Ms. Benson still had significantly more than nine occurrences, the threshold for termination in the Attendance Policy, and the undisputed evidence is that Wal-Mart terminated a great number of other associates with between nine and eleven occurrences.

There is, in short, no evidence that Wal-Mart seized on Ms. Benson's inability to be at work as scheduled, her refusal to communicate with store management when she called out, and her failure to produce documentation supporting her absences, as a pretext for retaliation. Instead, firing Ms. Benson after this pattern of truancy combined with her failure to provide documentation for her absences fits Wal-Mart's pattern with other employees.[4] Because Ms. Benson failed to adduce sufficient proof to show causation, and cannot show Wal-Mart's stated reasons for firing her are at all pretextual, Defendant is

---

[4] Between March 2016 and March 2017, the Windham Wal-Mart Store terminated 35 other associates for excessive absenteeism under the Attendance / Punctuality Policy. DSMF ¶ 73.

entitled to summary judgment on her MHRA and MWPA retaliation claims, Counts Two and Three.

## CONCLUSION

For the foregoing reasons, Defendant Wal-Mart Stores East, L.P.'s Motion for Summary Judgment (ECF No. 23) is GRANTED and the case is DISMISSED.

**SO ORDERED.**

Dated this 3rd day of April, 2020.

/S/ Lance E. Walker
**LANCE E. WALKER**
**UNITED STATES DISTRICT JUDGE**